FILED
2009 Sep-14  PM 04:24
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### EASTERN DIVISION

| | | |
|---|---|---|
| **NINA M. AUSTIN,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.: 1:08-CV-00913-RDP** |
| | } | |
| **MICHAEL J. ASTRUE, Commissioner** | } | |
| **of Social Security,** | } | |
| | } | |
| **Defendant.** | } | |

## <u>MEMORANDUM OPINION</u>

Plaintiff Nina M. Austin brings this action pursuant to Section 205(g) of the Social Security Act (the "Act") seeking review of the decision of the Commissioner of Social Security ("Commissioner") denying her application for a period of disability and Disability Insurance Benefits ("DIB"). *See* 42 U.S.C. §§ 405(g), 1383(c)(3). For the reasons outlined below, the court finds that the decision of the Commissioner is due to be affirmed.

## I.    Procedural History

Plaintiff filed her application for a period of disability and DIB under Title II on July 29, 2003. (Tr. 53). Plaintiff's application was denied initially and also upon review. (Tr. 32). Plaintiff requested and was granted a hearing before an Administrative Law Judge ("ALJ"). (Tr. 40, 42). Plaintiff's case was heard by ALJ Jerome L. Munford on April 18, 2005. (Tr. 343-73). In his February 22, 2006 decision, the ALJ determined that Plaintiff was not eligible for a period of disability or DIB because she failed to meet the disability requirements of the Act and retained the residual functional capacity ("RFC") to perform the exertional demands of light work. (Tr. 16-29).

The Appeals Council denied Plaintiff's request for review of the ALJ's decision on March 28, 2008. (Tr. 7-9, 13).  Plaintiff timely filed this civil action.

Plaintiff was born on January 6, 1945 and has a GED.  (Tr. 53, 350).  Plaintiff had previously worked as a supervisor at a sewing factory.  (Tr. 59, 351).  Plaintiff claims she has been unable to perform substantial gainful activity since her alleged onset date of disability, July 12, 2003, due to back and hip pain, Crohn's disease, and mitral valve prolapse.  (Tr. 58, 358).

During the April 18, 2005 hearing, Plaintiff testified that her pain emanated from the center of her back, both hips, and right leg.  (Tr. 351).  She claimed this pain existed prior to her November 2002 departure from Sweet Orr, the sewing factory where she worked.  (*Id*.).  She also stated that this pain has progressed since being diagnosed with osteoporosis in 2004.  (*Id*.).  Plaintiff further stated that the pain lasts all day, and affects her ability to concentrate during the day and to sleep at night.  (Tr. 352-53).  In her testimony, Plaintiff stated that she sits or lies down up to four hours a day, and when sitting she must adjust in her chair every 15 minutes or so. (Tr. 352, 354).  Plaintiff further testified that she is able to stand for 30 to 45 minutes and walk for 15 minutes, but due to pain, she must then sit or lie down.  (Tr. 354-55).  Plaintiff was asked during the hearing if she was capable of picking up a gallon of milk.  Plaintiff responded that she was not, but did testify that she is able to do the laundry, specifically lifting two or three pairs of jeans, or a couple of towels at a time.  (*Id*.).  Plaintiff also testified that her back stiffens when she walks.  (Tr. 355).

Plaintiff further alleges that because of her pain she is antisocial.  (Tr. 355).  Plaintiff has a driver's license and when asked how much she gets out of the house, she stated that she goes to the grocery store and Wal-Mart once or twice a week, and to church once a week.  (Tr. 362-63).  She stated that she gets up at 7:00 a.m., watches the news, takes a shower, dresses, does a little

2

housework, and starts cooking supper about 1:00 p.m. (Tr. 363). Plaintiff also testified that her back pain prevented her from working in the yard: "[W]hen you try, you come in, and you can't walk for two days." (Tr. 356). For relief, Plaintiff testified that she uses a microwavable rice bag to apply heat to the area affected by the pain. (Tr. 359).

Plaintiff also explained that she suffers from Crohn's disease, which she considers controlled. (Tr. 356). Additionally, Plaintiff stated that her heart will beat rapidly or slow down a couple of times a month, which she associates with mitral valve prolapse. (Tr. 357). When her heart rate is slow, Plaintiff claims she cannot get enough air and gasps. (*Id.*). Plaintiff testified that she will take a sedative and then lie down in a recliner with her legs elevated about two feet off of the floor. (Tr. 358-59).

When she worked as a line supervisor, Plaintiff supervised 40 people, trained them to sew, checked for quality, and monitored production levels. (Tr. 359). This job further required her to lift bundles and cartons which weighed 20 to 30 pounds. (Tr. 360). As a quality control supervisor, Plaintiff supervised three people, was required to lift 25 to 30 pounds, and as a head supervisor she supervised three supervisors and was required to lift only 10 to 15 pounds. (Tr. 361). Plaintiff stated that she was having back trouble during her time at the sewing factory. (Tr. 351). Plaintiff testified she stopped working in November 2002 when the sewing factory was closed. (Tr. 361). She further testified that she drew unemployment for a period of six months. (Tr. 362).

Plaintiff's medical evidence indicates that she has a history of low back pain dating back to the 1990's. (Tr. 98-103). In February 1999, Plaintiff received treatment from Dr. John Payne, an orthopedic surgeon, for complaints of low back, left hip, and left leg pain. (Tr. 144-50). X-rays taken revealed posterior facet arthritis at L4-5 and L5-S1. (Tr. 149). No major degenerative changes

were found other than osteoarthritic symptoms and posterior facet arthritis. (*Id*.). Plaintiff was prescribed medication for posterior facet arthritis of the lumbar spine and osteopenia of the spine and hip. (*Id*.).

Plaintiff returned on March 11, 1999 complaining again of pain in her hip, leg, and back. (Tr. 149). Dr. Payne diagnosed Plaintiff as having lumbar facet arthritis and suspected underlying degenerative disc disease. (Tr. 149). An epidural steroid injection was administered. (*Id*.).

In June 1999, Plaintiff was seen and treated for pain by Dr. Martin Jones, Jr. (Tr. 103). A magnetic resonance imaging ("MRI") was performed and was essentially normal, revealing no lateralizing side or spinal stenosis at any level and preservation of vertebral body height and disc space height. (Tr. 103). A CT myelogram revealed only mild degenerative changes and that neurologically Plaintiff was intact. (Tr. 101). Dr. Jones prescribed oral pain medication and recommended Plaintiff seek chiropractic treatment. (*Id*.).

Also in 1999, due to rectal bleeding, Plaintiff underwent a colonoscopy with Dr. James Hixon. (Tr. 114). The colonoscopy revealed Plaintiff had Crohn's disease and she was placed on medication. (*Id*.). Plaintiff's Crohn's disease has been continually monitored. (Tr. 106-14). The record reflects her condition has been quiescent, not active. (Tr. 106).

In April 2000, x-rays of Plaintiff's chest revealed bilateral interstitial fibrotic changes consistent with asbestosis. (Tr. 175).

In March 2001, Plaintiff returned to Dr. Jones, complaining of severe back and bilateral leg pain. (Tr. 98). She had some tenderness to deep palpitation of the low lumbar spine but there was no spasm. (*Id*.). Plaintiff was able to forward flex to 80 degrees; motor strength in the lower extremities was 5/5 and the sensation intact; straight leg raising was negative, bilaterally; and x-rays

4

of the lumbar spine, pelvis, and hips showed no significant abnormalities. (*Id.*). Plaintiff was again prescribed pain medication and instructed to seek chiropractic treatment. (*Id.*). It was noted that Plaintiff failed to follow the doctor's chiropractic instructions given during her previous visit. (*Id.*).

In April 2001, Plaintiff returned to Dr. Payne with complaints of low back pain. (Tr. 148-49). Another MRI was performed and revealed a perineural cyst on her left side at L5-S1. (Tr. 149). Plaintiff reported that the epidural she had received in 1999 had reduced her pain by 50%. (*Id.*). Plaintiff was given an epidural injection and an intrathecal injection, which she reports gave her no lasting benefit. (Tr. 148). On June 7, 2001 Dr. Payne prescribed oral medication to conservatively continue Plaintiff's treatment. (*Id.*).

During the time period June 27, 2001 through October 1, 2003, Plaintiff was seen by the physicians at MVP Physicians Group for mitral valve prolapse. (Tr. 151-61). Their records reveal Plaintiff experienced at least one episode of chest tightness. (Tr. 158). In addition to mitral valve prolapse, Plaintiff has been diagnosed with arrhythmia. (*Id.*) Both conditions are treated with medication. (*Id.*).

Plaintiff has received primary medical care through Dr. David Chalk and Dr. Ronald Calhoun at Anniston Family Practice since at least 1999. (Tr. 127). On May 7, 2002 Plaintiff presented to the clinic with complaints of dizzy spells and her "head feeling funny" for the previous three days. (Tr. 125). Plaintiff was prescribed medication for her dizziness. (*Id.*).

In June 2002, Plaintiff returned to Dr. Payne with complaints of pain in her lower back, right hip, and right leg. (Tr. 147). An MRI of her right hip revealed a possible sclerotic area in the right femoral head, but no fracture. (*Id.*). Plaintiff was again prescribed medication. (*Id.*).

5

On November 12, 2002, Plaintiff was examined by Dr. Payne for complaints of pain in the right elbow and in both knees.  (Tr. 146).  Plaintiff was experiencing tenderness over the lateral epicondyle compatible with lateral epicondylitis and crepitis and pain in her knees.  It was believed that Plaintiff suffered from patellofemoral arthritis.  (*Id.*).  The lateral aspect of Plaintiff's elbow was injected, but she chose to forego any knee injections.  (*Id.*).

In May 2003, Plaintiff returned to Dr. Payne with complaints of pain in her right shoulder. (Tr. 146).  Plaintiff was diagnosed with impingement, bursitis of the right shoulder and was given an injection in hopes that this would settle things down.  (*Id.*).  Plaintiff's pain was not resolved and on August 1, 2003, Plaintiff underwent right shoulder manipulation for adhesive capsulitis.  (Tr. 145).  This was followed by a month of physical therapy to improve strength and movement in her shoulder.  (*Id.*).  On a follow-up examination conducted September 12, 2003, Plaintiff still experienced some pain but the range of motion in her shoulder was at 95%.  (*Id.*).  Because she still had residual pain, an MRI was administered on her right shoulder which revealed some fluid in the bursa but no tear.  (Tr. 144).  On both October 31, 2003 and January 5, 2004, Plaintiff requested and was given injections to her right shoulder to relieve pain.  (Tr. 274).

On March 17, 2003, Plaintiff was again seen at Anniston Family Practice complaining of dizziness, high blood pressure, and palpitations.  (Tr. 122).  Plaintiff was diagnosed with transient ischemia attack ("TIA") after experiencing dizziness.  (*Id.*).  A cranial CT scan performed on March 19, 2003 showed no intracranial mass or other abnormality and a carotid artery scan showed no major stenosis.  (Tr. 120-21).  An x-ray of Plaintiff's cervical spine performed the same day revealed degenerative disc disease with spondylosis at C5-C6.  (Tr. 119).

A bone density test reviewed on April 13, 2004 confirmed Dr. Payne's previous diagnosis of osteopenia of the lumbar spine, for which Plaintiff was placed on oral medications.  (Tr. 273).

On March 22, 2004, Plaintiff returned to Dr. Payne with complaints of pain in her back and hips.  (Tr. 178).  X-rays of Plaintiff's lumbar spine suggested significant osteoporosis.  (*Id*.).  Two days later Plaintiff was given an epidural steroid injection.  (*Id*.).  Bone density study results performed on March 31, 2004 confirmed osteoporosis.  (*Id*.).  Because of the diagnosis of osteoporosis, Plaintiff was placed on calcium and vitamin D.  (*Id*.).

On July 22, 2004, Plaintiff was admitted to Northeast Alabama Regional Medical Center after being awakened by chest pain.  (Tr. 182).  She underwent cardiac testing, including an electrocardiogram, thallium stress, cardiogram Doppler, and echocardiogram.  (Tr. 186, 210-15).  Plaintiff was discharged to return home the next day with a diagnosis of chest pain, noncardiac in origin.  (Tr. 186).

In October 2004, Plaintiff again met with Dr. Payne complaining of pain in her lower back and buttocks.  (Tr. 273).  Plaintiff was diagnosed with lumbar spondylosis and degenerative disc disease.  (*Id*.).  An intramuscular injection, as well as an epidural at L 4, 5 was administered.  (*Id*.).

An MRI of Plaintiff's lumbar spine on October 7, 2004, revealed the vertebral body heights and disc space heights were preserved.  (Tr. 275).  There was a 7 mm perineural cyst in the left L2 neuroforamina, and at the L5-S1 level, a conjoined nerve root sleeve on the left, as well as a 10 mm perineural cyst in the left neuroforamina.  (*Id*.).  On October 8, 2004, Plaintiff received another epidural injection.  (Tr. 273).

On October 14, 2004, Dr. Jose Oblena, completed a consultative physical examination of Plaintiff.  (Tr. 261-70).  On examination, Plaintiff's cervical spine showed no deformity or spasm;

both upper and lower extremities showed no deformity, crepitance, swelling, redness, and heat; her dorsolumbar spine was positive for tenderness and spasm; and straight leg motion was normal in the elbows, wrists, hands, fingers, cervical spine, lumbar spine, hips, knees, and ankles. (Tr. 261, 264, 266-67). Range of motion in Plaintiff's left shoulder was normal throughout and range of motion in her right shoulder was slightly decreased. (Tr. 264). Plaintiff was able to oppose her finger to the thumb; her pinch and grip strength was intact; fine and gross manipulation were intact; and strength of all major muscle groups was 5/5 with no atrophy. (Tr. 261). Plaintiff's gait was normal with minimal ambulation without device. (Tr. 262). Dr. Oblena diagnosed Plaintiff with lumbar degenerative disc disease, osteoporosis, gastroesophageal reflux disease (GERD), mitral valve prolapse, and Crohn's disease. (Tr. 263).

Dr. Oblena completed a medical source opinion and expressed his view that Plaintiff could do the following: sit for two hours at one time for a total of three hours in an eight hour day; stand for two hours at one time for a total of three hours in an eight hour day; walk for 30 minutes at a time for two hours in an eight hour day; could frequently lift and carry 15 pounds; frequently climb, balance, handle, finger, feel objects, and use the left arm and leg to push/pull. (Tr. 268-69). Dr. Oblena also made the following observations: Plaintiff could occasionally reach overhead, stoop, kneel, crouch, and use her right arm to push/pull; never crawl, but could occasionally work in environments involving exposure to extreme cold, extreme heat, fumes, noxious odors, dust, mists, gases, poor ventilation, proximity to moving mechanical parts, and high exposed places; and that she could never drive automotive equipment. (Tr. 268-70).

On March 14, 2005, Plaintiff was examined at Anniston Family Practice with chief complaints of GERD and shin lesions. Plaintiff was continued on her same medication. (Tr. 314).

On April 15, 2005, Plaintiff was administered another epidural injection because of pain in her lower back. (Tr. 311).

II.     **ALJ Decision**

Determination of disability under the Act requires a five-step analysis. *See* 20 C.F.R. § 404.1 *et. seq.* First, the Commissioner determines whether the claimant is working. Second, the Commissioner determines whether the claimant has an impairment which prevents the performance of basic work activities. Third, the Commissioner determines whether the claimant's impairment meets or equals an impairment listed in Appendix 1 of Part 404 of the Regulations. Fourth, the Commissioner determines whether the claimant's RFC can meet the physical and mental demands of past work. The claimant's RFC consists of what the claimant can do despite her impairment. Finally, the Commissioner determines whether the claimant's age, education, and past work experience prevent the performance of any other work. In making a final determination, the Commissioner will use the Medical-Vocational Guidelines in Appendix 2 of Part 404 of the Regulations when all of the claimant's vocational factors and RFC are the same as the criteria listed in the Appendix. If the Commissioner finds that the claimant is disabled or not disabled at any step in this procedure, the Commissioner will provide no further review of the claim.

The court recognizes that "the ultimate burden of proving disability is on the claimant" and that the "claimant must establish a *prima facie* case by demonstrating that [s]he can no longer perform h[er] former employment." *Freeman v. Schweiker*, 681 F.2d 727, 729 (11th Cir. 1982) (other citations omitted). Once a claimant shows that she can no longer perform her past employment, "the burden then shifts to the [Commissioner] to establish that the claimant can perform other substantial gainful employment." (*Id.*).

9

At the hearing, the ALJ called a vocational expert ("VE") to testify who was familiar with Plaintiff's background. (Tr. 362-71). The VE testified that Plaintiff's past relevant work as a line supervisor, quality control supervisor, and plant supervisor were classified as skilled and in the intensity categories of light to light medium work. (Tr. 364). The VE stated that these jobs provided Plaintiff with limited transferable job skills. (Tr. 365). When asked to consider Plaintiff's age, education, work experience, and assigned RFC, the VE opined that Plaintiff could return to her past relevant work as a supervisor. (Tr. 366). Based on the VE's testimony and his assessment of Plaintiff's RFC, the ALJ found that Plaintiff is capable of performing past relevant work as a shift supervisor. (Tr. 26).

The ALJ found that Plaintiff has not engaged in substantial gainful activity since July 12, 2003, her alleged onset date of disability. (Tr. 28). The ALJ determine that Plaintiff has severe impairments of pain in the lower back, hip, and right leg; mitral valve prolapse; and Crohn's disease. However, the ALJ determined Plaintiff's impairments do not meet or equal any impairment listed in Appendix 1 to Subpart P, 20 CFR, Part 404. (Tr. 25, 28). According to the ALJ, Plaintiff's subjective complaints concerning her impairments and their intensity, persistence, and limiting effects were not fully credible due to their inconsistency with objective clinical evidence and the opinions of Plaintiff's treating and consulting physicians. (*Id.*). The ALJ determined that Plaintiff retains the RFC to perform medium exertional work requiring occasional bending, stooping, squatting, or pushing or pulling of the upper extremities, no overhead reaching, no excessive exposure to cold or damp environments, and no driving. (Tr. 28).

## III.    Plaintiff's Argument for Remand or Reversal

Plaintiff seeks to have the ALJ's decision, which became the final decision of the Commissioner following the expiration of the period for Plaintiff to file objections, reversed and remanded for further consideration. (Doc. #1 at 2). Plaintiff asserts the ALJ improperly discounted Plaintiff's testimony of pain and failed to fully and fairly develop the record consistent with Eleventh Circuit law.

## IV.    Standard of Review

The only issues before this court are whether the record reveals substantial evidence to sustain the ALJ's decision, *see* 42 U.S.C. § 405(g); *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982), and whether the correct legal standards were applied. *See Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988); *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). Title 42 U.S.C. §§ 405(g) and 1383(c) mandate that the Commissioner's findings are conclusive if supported by "substantial evidence." *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). The district court may not reconsider the facts, reevaluate the evidence, or substitute its judgment for that of the Commissioner; instead, it must review the final decision as a whole and determine if the decision is reasonable and supported by substantial evidence. *See id.* (*citing Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

Substantial evidence falls somewhere between a scintilla and a preponderance of evidence; "[i]t is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Martin*, 894 F.2d at 1529 (*quoting Bloodsworth*, 703 F.2d at 1239) (other citations omitted). If supported by substantial evidence, the Commissioner's factual findings must be affirmed even if the evidence preponderates against the Commissioner's findings. *See Martin*, 894

F.2d at 1529.  While the court acknowledges that judicial review of the ALJ's findings is limited in scope, the court also notes that review "does not yield automatic affirmance." *Lamb*, 847 F.2d at 701.

## V.    Discussion

In light of the legal standards that apply in this case, the court rejects Plaintiff's arguments for reversal and remand.  For the reasons outlined below, the court finds that the ALJ relied on substantial evidence and applied the proper legal standards.

### A.    The ALJ Properly Weighed Plaintiff's Subjective Complaints of Pain

Plaintiff argues that the ALJ did not give her subjective complaints of pain sufficient weight. Specifically, Plaintiff argues that the ALJ's decision is not supported by substantial evidence because the ALJ did not properly apply the Eleventh Circuit Pain Standard.  The law that governs subjective complaints of pain is well-settled:

> In order to establish a disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test showing: (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain. *See Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). If the ALJ discredits subjective testimony, he must articulate explicit and adequate reasons for doing so. Failure to articulate the reasons for discrediting subjective testimony requires, as a matter of law, that the testimony be accepted as true.

*Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002) (some citations omitted).

Plaintiff alleges she is unable to work due to shoulder, back, hip, and leg pain.  (Tr. 351). The ALJ found that Plaintiff has severe impairments of pain in the lower back, hip, and right leg, as well as mitral valve prolapse and Crohn's disease.  (Tr. 28).  However, the ALJ found Plaintiff's allegations that her pain impacted her ability to work were not credible in light of her medical

12

history, the reports of her treating and examining practitioners, and the findings made on examination. Specifically Plaintiff's own testimony regarding the intensity and duration of her pain was not entirely credible. The ALJ noted that while the findings of Dr. Payne, Plaintiff's treating physician in excess of six years, confirm abnormalities of her back, there is no evidence of disc herniation or stenosis. Records from Dr. Payne indicated that the pain in Plaintiff's right shoulder is manageable and that her range of motion was 95%. Dr. Oblena's examination of Plaintiff was essentially unremarkable with the exception of tenderness and muscle spasms in the dorsolumbar spine. Like Dr. Payne, Dr. Oblena noted that Plaintiff's right shoulder had only a slight decrease in range of motion.

The record, as well as Plaintiff's own testimony, indicates that her Crohn's disease is under control and inactive. Also, the record evidence indicated that Plaintiff's mitral valve prolapse is mild. The record contained no medical evidence suggesting the need for Plaintiff to keep her legs elevated. Further, the VE concluded that Plaintiff could perform a significant range of medium level work, as well as her previous occupation as a supervisor. While Plaintiff proved a longitudinal history that supports her disability claim, the ALJ discredited her subjective pain testimony based on sufficient findings of fact, noting the absence of corroborating diagnostic studies.

Considering the ALJ's findings in light of the applicable standard of review, the court finds no error. The ALJ properly considered Plaintiff's history of shoulder, back, hip, and leg pain and the treatment she received. The ALJ weighed Plaintiff's subjective complaints and concluded that, while the medical evidence supported a finding of some pain and restrictions, the evidence did not show that Plaintiff was disabled because of her pain. In discounting Plaintiff's subjective testimony,

the ALJ relied upon substantial evidence and properly applied the pain standard which has been
formulated by the Eleventh Circuit in *Wilson*.

### B.     The ALJ Did Not Fall to Fully and Fairly Develop the Record

Plaintiff also argues that the ALJ erred by failing to fully and fairly develop the record.  The
court disagrees.  Although the ALJ did not specifically describe the weight he gave Dr. Oblena's
functional capacity assessment, he clearly distinguished it from the actual examination findings of
Dr. Oblena, to which he accorded significant weight.  (Tr. 24, 26).  Any lack of further detail was
at most harmless error, and remand for the ALJ to provide more articulation would serve no practical
or legal purpose.  First, nothing before the court suggests that remand would change the ALJ's
decision.  Moreover, remand would waste judicial and administrative resources, particularly given
the obvious and inherent inconsistencies between Dr. Oblena's examination findings and his
functional capacity assessment.[1]  *See Graham v. Apfel*, 129 F.3d 1420, 1423 (11th Cir. 1997) (finding
that a case should not be remanded without a showing of prejudice).  Accordingly, Plaintiff's second
argument fails, also.

## VI.     Conclusion

For the reasons stated above, the court concludes that the ALJ's determination that Plaintiff
is not disabled is supported by substantial evidence and the proper legal standards were applied in
reaching this determination.  The Commissioner's final decision is due to be affirmed, and a separate
order in accordance with this memorandum opinion will be entered.

---

[1]Again, the ALJ fully discussed the other medical source evidence, all of which provides
substantial evidence in support of his REC and credibility findings.  (Tr. 21-26).  The court will not
summarize that evidence again here.

**DONE** and **ORDERED** this ____14th____ day of September, 2009.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE